The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
September 2, 2021

## 2021COA118

**No. 18CA1847, *People v. Pellegrin* — Crimes — Posting a
Private Image for Harassment — Stalking — Harassment;
Criminal Law — Prosecution of Multiple Counts for Same Act —
Lesser Included Offenses**

In this "revenge porn" case, a division of the court of appeals
decides two novel issues.  First, does the term "breast of a female,"
in section 18-7-107, C.R.S. 2020 (posting a private image for
harassment), require the image to display the whole breast or only a
portion of the breast?  The division holds that an image posted for
harassment need only display a portion of the female breast.

Second, is harassment, § 18-9-111(1)(e), C.R.S. 2020, a lesser
included offense of stalking, § 18-3-602(1)(c), C.R.S. 2020, under
section 18-1-408(5)(c), C.R.S. 2020?  The division concludes that it
is not because the harassment and stalking statutes fail the single
distinction test required by section 18-1-408(5)(c).

Court of Appeals No. 18CA1487
El Paso County District Court No. 17CR4220
Honorable William B. Bain, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Trevor A. Pellegrin,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE FREYRE
Yun and Graham*, JJ., concur

Announced September 2, 2021

Philip J. Weiser, Attorney General, Brittany L. Limes, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily C. Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     In this "revenge porn" case, we are asked to decide two novel issues.  First, we are asked to interpret the term "breast of a female" under the posting a private image for harassment statute, § 18-7-107, C.R.S. 2020.  Section 18-7-107(1)(a) criminalizes the posting or distribution of an image displaying the private intimate parts of an identified or identifiable person on social media or any website.  "Private intimate parts" is defined as "external genitalia or the perineum or the anus or the pubes of any person or the breast of a female."  § 18-7-107(6)(c).  The statute, however, does not define "breast of a female."

¶ 2     We first conclude that "breast of a female" is ambiguous and can reasonably be interpreted to mean either the whole breast or simply a portion of the breast.  We next conclude, consistent with the legislative history, that "breast of a female" means any portion of the female breast.  Finally, we conclude that the statute is not unconstitutionally vague or overbroad.

¶ 3     We are also asked to decide whether harassment, § 18-9-111(1)(e), C.R.S. 2020, is a lesser included offense of stalking, § 18-3-602(1)(c), C.R.S. 2020, under section 18-1-408(5)(c), C.R.S. 2020.  We conclude that the statutes fail the single distinction test set

1

forth in section 18-1-408(5)(c) because they differ in more than one respect and, therefore, affirm the convictions for stalking, posting a private image for harassment, and harassment.

## I.    Background

¶ 4    Defendant, Trevor A. Pellegrin, and the victim began dating in 2016, and they moved in together shortly thereafter.  They were later engaged.  During their relationship, the victim allowed Pellegrin to take private, intimate photos of her in various stages of undress.  The victim ended the relationship in April 2017 and moved into an apartment with her sister.

¶ 5    After the breakup, the victim had limited contact with Pellegrin until July 2017.  Although the victim was in a new relationship with another man, she and Pellegrin spent time together between July 16 and July 19, 2017.  Unbeknownst to Pellegrin, the victim had plans to see the other man on the evening of July 19.

¶ 6    After learning the victim was seeing someone else, Pellegrin repeatedly called and texted the victim from July 19 into July 20.  He called the victim lewd names and sent nude photos he had taken of her during their relationship.  Pellegrin threatened to post the nude photos online and to send them to her twelve-year-old

brother.  Distraught by Pellegrin's texts, the victim left work early on July 20 and reported the texts to the police.  The police viewed the text messages, but they told the victim they could do nothing until Pellegrin posted the photos online.  Pellegrin continued repeatedly texting the victim until July 23, 2017.

¶ 7    Between July 20 and July 23, 2017, multiple family members told the victim that her Facebook profile had been altered.  She looked at her Facebook profile page and saw that her cover and profile photos had been changed to nude photos of her on a bed.  The cover photo was of her nude buttocks, legs, and back, while her profile page displayed a nude photo of her lying on her stomach propped up by her elbows with the side of her right breast exposed.  She recognized these as photos Pellegrin had taken while they were dating.  Her profile biography had also been changed to say the victim was an "awful" person, a "cheater," and a "slut."

¶ 8    Additionally, on July 23, 2017, the victim received numerous text messages and photos from strangers responding to a Craigslist advertisement.  They included messages saying unknown people were driving by her home and random, unknown photos of male

genitalia. She learned that a Craigslist ad had been posted on the "casual encounters" board stating,

> So my name's [victim's name] I live in the springs I'm looking for a few guys to come show me a good time I've never tried this but I'm willing to try it you can find me on Facebook just search my name [victim's name] my phone number is [victim's phone number] please call me with what your interested in and maybe we can get together tonight I stay off [directions to the victim's home]. Surprise me [emojis] text me a nude photo of yourself to get mines [emoji][.]

The ad also showed four photos of her — the two photos posted on Facebook, a photo of her clothed lying on a bed, and an additional photo showing the side of her nude breast.

¶ 9    A second Craigslist advertisement was posted on the "free stuff" board titled "Free engagement ring." The ad included the same photos as the "casual encounters" ad and it said, "Text or call for a free good time [the victim's phone number]."

¶ 10    The victim again contacted the police and provided a statement and her cell phone. The police arrested Pellegrin at his home. He admitted to posting "some photos that he considered butt shots, and that he had posted them for approximately an hour and then they were pulled down."

4

¶ 11    The State charged Pellegrin with one count of stalking, two counts of posting a private image for harassment (one for Facebook and one for Craigslist), and one count of harassment. At trial, defense counsel argued that the victim posted nude photos of herself and then blamed Pellegrin because she wanted to get him in trouble. A jury convicted Pellegrin of stalking, posting a private image for harassment (Craigslist), and harassment, but it acquitted him of the other charge of posting a private image for harassment (Facebook).

¶ 12    The court sentenced Pellegrin to three years of supervised probation and ninety days in jail. It also made a domestic violence finding and ordered Pellegrin to participate in a domestic violence evaluation and comply with its recommendations.

## II.    Jury Poll

¶ 13    Pellegrin first contends that the trial court abused its discretion by not granting a mistrial after polling revealed that the verdicts were not unanimous. He asserts that the manner in which the court conducted the jury poll was coercive. We disagree.

5

## A. Additional Facts

¶ 14     After deliberations, the jury returned guilty verdicts on all counts. The trial court polled the jury at defense counsel's request, asking each juror "if these are indeed your verdicts." Juror 8 responded, "No"; and when the court asked, "These are not your verdicts," Juror 8 said, "Nope." The court ceased polling and provided the following instruction:

> Well, members of the jury, I'm going to send you back for continuing deliberations. It is a requirement of the law that all verdicts be unanimous. And it sounds like . . . we have not reached unanimity. So it's about 4:35. I'll have you head back into the jury deliberation room. Again, I plan to let you go at 4:50. So we'll come back and get you at 4:50. All right.

¶ 15     Defense counsel moved for a mistrial. He was concerned about potential juror misconduct or the "jury bullying with Juror 8" to return a guilty verdict. The prosecutor argued that these concerns were "purely speculative." In the alternative, defense counsel asked the trial court to individually question Juror 8 about the nonunanimous verdict. The court denied the motion for a mistrial and denied the request to question Juror 8. It reasoned that there was

6

> no evidence on which to base a conclusion that the other jurors are back there right now improperly coercing Juror Number 8 to reach a guilty verdict. As I mentioned earlier when I asked Number 8 if these were her verdicts, she very assertively . . . said no, these are not her verdicts. So at least by appearances, she [does] not present as somebody [who] was meek and to be bullied into reaching a decision. I'll add that she said these are not her verdicts almost with a tone of defiance.

And the court found it lacked the authority to question Juror 8 about deliberations under CRE 606(b).

¶ 16    Later, and immediately following the court's evening recess instruction, Juror 8 stated, "[T]hey cleared it up for me what's I was confused about, so now I agree." The prosecutor asked the court to allow the jury to deliberate a "bit longer . . . because it sounds like they're close." The court declined the request and again instructed the jury to return the next day.

¶ 17    The following day, the jury deliberated two more hours before returning new verdict forms finding Pellegrin guilty of stalking, posting a private image for harassment (Craigslist), and harassment, and acquitting him of posting a private image for harassment (Facebook). Subsequent polling confirmed a unanimous verdict.

## B. Standard of Review and Applicable Law

¶ 18    We review a trial court's denial of a motion for a mistrial for an abuse of discretion. *People v. Johnson*, 2017 COA 11, ¶ 39. A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.* Under this standard, the test is not "whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options." *People v. Salazar*, 2012 CO 20, ¶ 32 (Bender, C.J., dissenting) (quoting *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230-31 (Colo. App. 2006)).

¶ 19    A trial court is responsible for ensuring that a conviction is the result of a unanimous verdict. *People v. Rivera*, 56 P.3d 1155, 1160-61 (Colo. App. 2002); *see also* § 16-10-108, C.R.S. 2020; Crim. P. 23(a)(8), 31(a)(3). "Unanimity requires a deliberative process that expresses the conscientious conviction of each individual juror." *People v. Phillips*, 91 P.3d 476, 479 (Colo. App. 2004).

¶ 20    Under Crim. P. 31(d),

> [w]hen a verdict is returned and before it is recorded, the jury shall be polled at the request of any party or upon the court's own

8

motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

¶ 21 The right to a jury poll, however, is not absolute. *Phillips*, 91 P.3d at 479. The manner of conducting a jury poll is within the trial court's discretion. *Id.*

## C. Analysis

¶ 22 Relying on several factors considered in *Harris v. United States*, 622 A.2d 697, 705 (D.C. 1993), Pellegrin argues that after Juror 8 identified herself as a dissenting juror, the court should have inquired into whether the jury was deadlocked and provided further instructions to alleviate any coercive effect. However, we decline to adopt the *Harris* factors as the exclusive means of analyzing this issue and, instead, apply a general abuse of discretion standard consistent with our case law and the jury poll rule. *See People v. Barnard*, 12 P.3d 290, 295 (Colo. App. 2000) ("We review the court's consideration of a juror's doubt as to his or her verdict under an abuse of discretion standard."); *see also Phillips*, 91 P.3d at 479. Under this standard, we conclude, for three reasons, that the trial court acted within its discretion by

9

declining to declare a mistrial after instructing the jury to continue deliberations.

¶ 23     First, the trial court's instruction to continue deliberations was not coercive.  The court did not set a deadline to return verdicts.  Nor did it tell the jury that unless its deliberations resulted in a unanimous verdict, a mistrial would be declared.  *Cf. Allen v. People*, 660 P.2d 896, 898 (Colo. 1983) ("[T]he court's arbitrary fifteen minute deadline [to return a verdict or a have a mistrial declared] may have prevented the jury from reaching a well-considered verdict.").  It told the jury to continue deliberations until 4:50 p.m., the time at which the court had previously instructed the jury it would be excused.  And, when the jury returned, the court declined to take a verdict, and instead told the jurors to "take a break from the case" for the evening and resume deliberations the following morning.  Indeed, the jury deliberated for an additional two hours the following morning and returned a different verdict.

¶ 24     Second, though Pellegrin relies on *People v. Black*, 2020 COA 136, for the proposition that the trial court should have inquired into whether the jury was deadlocked, that reliance is misplaced.  In *Black*, a deliberating juror asked the court, "What happens if we

10

can't come to a unanimous decision on only one charge?" *Id.* at ¶ 8. The court instructed the jury to continue deliberations without first determining whether it was deadlocked and, if so, how intractably. *Id.* The division found error in the trial court's failure to inquire about whether the jury was deadlocked and thus, it could not determine whether the court's instruction to continue deliberating was coercive. *Id.* at ¶¶ 24, 31.

¶ 25    In contrast, the court here learned only that the verdict was not unanimous, not that the jury was deadlocked. *Cf. People v. Martinez,* 987 P.2d 884, 888 (Colo. App. 1999) (holding that if a juror gives an equivocal response to a jury poll, a trial court may make additional inquiries to determine if the verdict is unanimous). Without some indication that the jury could not reach a unanimous verdict, any extensive questioning about the deliberative process or about why the verdict was not unanimous would have been improper. *Gibbons v. People,* 2014 CO 67, ¶ 32 ("Absent some affirmative indication from the jury that it harbors this concern, the trial court should not interfere with the jury's deliberative process."); *see also People v. Juarez,* 271 P.3d 537, 544 (Colo. App. 2011); *Martinez,* 987 P.2d at 888.

¶ 26    Third, the trial court did not abuse its discretion by finding, based on her response to the poll and her demeanor, that Juror 8 was unlikely to be bullied into a guilty verdict.  *See Barnard*, 12 P.3d at 295.  And Pellegrin's counsel presented no evidence, beyond mere speculation, that the remaining jurors bullied Juror 8 into finding him guilty.  Indeed, the jury returned a different and more favorable (to Pellegrin) verdict after further deliberations.

¶ 27    Accordingly, we discern no error.

## III.   Constitutionality of Stalking Statute

¶ 28    Pellegrin next contends that the stalking statute, § 18-3-602, is unconstitutional on its face because the statute is overbroad. Because we are bound by the supreme court's contrary holding in *People v. Cross*, 127 P.3d 71 (Colo. 2006), we reject his assertion and conclude the statute is facially constitutional.

### A.    Standard of Review and Applicable Law

¶ 29    We review the constitutionality of a statute de novo, but presume that statute is constitutional.  *People v. Folsom*, 2017 COA 146M, ¶ 70.

¶ 30    Section 18-3-602(1)(c) provides as follows:

12

(1) A person commits stalking if directly, or indirectly through another person, the person knowingly:

. . . .

(c) Repeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship to suffer serious emotional distress. For purposes of this paragraph (c), a victim need not show that he or she received professional treatment or counseling to show that he or she suffered serious emotional distress.

¶ 31    In *Cross*, our supreme court concluded that a substantially similar stalking statute is not unconstitutionally overbroad. The court noted that the statute criminalizes only conduct that involves a "severe intrusion upon the victim's personal privacy and autonomy, with an immediate and long-lasting impact on quality of life as well as risks to security and safety of the victim and persons close to the victim." Cross, 127 P.3d at 79 (quoting former § 18-9-111(4)(a), C.R.S. 2005, repealed, amended, and relocated, §§ 18-3-

601 to -602, C.R.S. 2011 (effective Aug. 11, 2010)). It held that the sweep of the statute does not include a substantial amount of constitutionally protected speech because the statute criminalizes only acts of a particular nature — acts involving inappropriate intensity, persistence, and possessiveness, and severe intrusions on a victim's personal privacy and autonomy — and that had a particular effect — objectively and subjectively causing serious emotional distress. *Id.*

## B. Analysis

¶ 32 We reject Pellegrin's contention that the stalking statute is unconstitutionally overbroad and reject his reliance on the Illinois Supreme Court's decision in *People v. Relerford,* 104 N.E.3d 341 (Ill. 2017). In doing so, we follow our supreme court's desicion in *Cross,* 127 P.3d at 78-79, as we must. *People v. Richardson,* 181 P.3d 340, 343-45 (Colo. App. 2007); *see also People v. Smith,* 183 P.3d 726, 729 (Colo. App. 2008) (rejecting defendant's argument that supreme court precedent was wrongly decided because we are bound by Colorado Supreme Court decisions).

¶ 33 We also reject Pellegrin's contention that *Reed v. Town of Gilbert,* 576 U.S. 155 (2015), compels a different result. In *Reed,*

14

the Supreme Court held that the Town of Gilbert's exemption of categories of signs including "ideological" and "political" signs from its prohibition on the display of outdoor signs without a permit was unconstitutional. *Id.* at 159-60. The Court reasoned that content-based laws — those that target speech based on the "topic discussed or the idea or message expressed" — are presumptively unconstitutional. *Id.* at 163. Content-based laws include laws that appear facially neutral but cannot be justified without reference to the content of the regulated speech or were adopted because of a disagreement with the message that the speech conveys. *Id.* at 163-64. The Court went on to conclude that the laws in that case imposed content-based restrictions because the laws applied more stringent restrictions on various types of signs, which compelled an analysis of the content of the signs. *Id.* at 159, 171-72.

¶ 34     Colorado's stalking statute, on the other hand, targets repeated *conduct* that would "cause a reasonable person to suffer serious emotional distress." § 18-3-602(1)(c). Thus, whether speech is permitted under the stalking statute is not based on the content of that speech but, rather, on whether that speech is part of a *series* of conduct in which a defendant "[r]epeatedly follows,

15

approaches, contacts, places under surveillance, or makes any form of communication with another person . . . ." *Id.* Indeed, "the statute does not criminalize innocuous behavior," but criminalizes a series of conduct without a significant impact on constitutionally protected speech. *Cross*, 127 P.3d at 78-79; *see also Dugan v. State*, 2019 WY 112, ¶ 22, 451 P.3d 731, 739 (The fact that the criminal stalking statute "identifies 'lewd or obscene statements' in the definition of harass does not make it a content-based regulation on speech rather than a regulation of conduct without a significant impact on protected speech.").

IV.    Sufficiency of the Evidence

¶ 35    Pellegrin next contends that the photos posted in the Craigslist ads insufficiently established the element of "private intimate parts" required for his conviction of posting a private image for harassment. He asserts that the photo showing the side of the victim's exposed breast is not a photo depicting the "breast of a female" under the definition of "private intimate parts" because the "entire breast" was not displayed. *See* § 18-7-107(1)(a), (6)(c). Alternatively, he argues that the statute is vague and overbroad if

"breast of a female" is interpreted to include less than the entire breast. We address each argument in turn.

### A. Standard of Review and Applicable Law

¶ 36 In assessing the sufficiency of the evidence to support a conviction, we review the record de novo to determine whether the evidence, viewed in the light most favorable to the prosecution, was substantial and sufficient to support a conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt. *People v. Perez*, 2016 CO 12, ¶ 8.

¶ 37 We also review questions of statutory interpretation de novo. *Id.* When construing a statute, our primary task is to ascertain and give effect to the General Assembly's intent. *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007). We begin with the statute's plain language. *People v. Huckabay*, 2020 CO 42, ¶ 13. "If the language is clear and unambiguous on its face, we simply apply it as written and will not resort to other interpretive aids." *Id.* We "respect the legislature's choice of language," and we "do not add words to the statute or subtract words from it." *Turbyne*, 151 P.3d at 567-68.

¶ 38 If, however, the language is susceptible of more than one reasonable meaning, it is ambiguous. *Marquez v. People*, 2013 CO

17

58, ¶ 7. "In that event, a number of intrinsic and extrinsic aids to construction have [been] developed to assist in resolving the ambiguity and determining which of the various reasonable interpretations is the appropriate one." *Id.*

¶ 39    As relevant here, a person who is eighteen years or older commits the offense of posting a private image for harassment if

> he or she posts or distributes through the use of social media or any website any photograph, video, or other image displaying the private intimate parts of an identified or identifiable person eighteen years of age or older or an image displaying sexual acts of an identified or identifiable person:
>
> (I) With the intent to harass, intimidate, or coerce the depicted person;
>
> (II)(A) Without the depicted person's consent; or
>
> (B) When the actor knew or should have known that the depicted person had a reasonable expectation that the image would remain private; and
>
> (III) The conduct results in serious emotional distress of the depicted person.

§ 18-7-107(1)(a). The term "'[p]rivate intimate parts' means external genitalia or the perineum or the anus or the pubes of any person or the *breast of a female.*" § 18-7-107(6)(c) (emphasis added).

## B.     Breast of a Female

¶ 40     The General Assembly did not define "breast of a female" when defining "private intimate parts."  Pellegrin argues that the term "breast of a female" is unambiguous and plainly means the "entire breast."  He reasons that because the photo here depicted only the right side of the victim's exposed breast, not her entire breast or the nipple, insufficient evidence supports the jury's verdict.  We are not convinced and conclude instead that the term "breast of a female" is susceptible of more than one reasonable interpretation (i.e., the entire female breast, any portion of the female breast from the top of the areola down, the female nipple, etc.) and is therefore ambiguous as applied to this case.  Accordingly, we turn to interpretative aids to resolve the ambiguity.

¶ 41     In *People v. Gagnon*, 997 P.2d 1278 (Colo. App. 1999), a division of this court considered whether a photo depicting a portion of a child's breast was sufficient to support a conviction of sexual exploitation of a child, § 18-6-403, C.R.S. 2020.  We find the *Gagnon* division's analysis of the statutory definition of "erotic nudity" analogous here.

19

¶ 42    A person commits sexual exploitation of a child by knowingly causing a child to engage in the making of any "sexually exploitative material." § 18-6-403(3)(a).  "Sexually exploitative material" includes "erotic nudity." § 18-6-403(2)(e), (j).  Similar to the inclusion of "breast of a female" in the definition of "private intimate parts" under section 18-7-107(6)(c), the definition of "erotic nudity" includes the display of "the human breasts, or the undeveloped or developing breast area of the human child." § 18-6-403(2)(d).  The division rejected the defendant's contention that the statute did not apply to his conduct because the photos did not display the child's whole breast or include the nipple.  *Gagnon*, 997 P.2d at 1281.  It reasoned that this argument ignored the requirement that "erotic nudity" — a display or picture of the human breasts or undeveloped or developing breast area of a child — "must be for the purpose of real or simulated overt sexual gratification or stimulation of one or more of the persons involved."  *Id.* at 1281-82.  In doing so, the defendant had not considered the harm the statute was intended to address.  *Id.* at 1282.

¶ 43    Similarly, Pellegrin's argument emphasizes the term "breast of a female" in the definition of "private intimate parts" to the

20

exclusion of the statute's purpose and the harm it was intended to address.

¶ 44    The General Assembly sought to protect victims of "revenge porn" by enacting the posting of a private image for harassment statute.  H.B. 14-1378, 69th Gen. Assemb., 2d Reg. Sess. (Colo. 2014).  Testimony leading to the statute's enactment focused on the harm caused to victims by posting images displaying "private intimate parts" on social media or any website — including job loss, humiliation with family and friends, unwanted sexual requests and comments, stalking, threats by intimate partners and strangers, and even suicide — and the inadequate protections for them.  *See* Hearings on H.B. 14-1378 before the H. Judiciary Comm., 69th Gen. Assemb., 2d Reg. Sess. (Apr. 24, 2014); Hearings on H.B. 14-1378 before the S. Judiciary Comm., 69th Gen. Assemb., 2d Reg. Sess. (Apr. 30, 2014); 2d Reading on H.B. 14-1378 before the S., 69th Gen. Assemb., 2d Reg. Sess. (May 2, 2014).

¶ 45    In 2018, the statute was amended in multiple ways, most notably to include the posting of "an image displaying sexual acts of an identified or identifiable person."  Ch. 192, sec. 1, § 18-7-107, 2018 Colo. Sess. Laws 1276-77.  "Displaying sexual acts" is defined

as "any display of sexual acts *even if the private intimate parts are not visible* in the image." *Id.* (emphasis added). This amendment closed a loophole that had allowed persons to avoid liability by posting images of sexual acts that did not depict private intimate parts. *See* Hearings on H.B. 18-1264 before the H. Judiciary Comm., 71st Gen. Assemb., 2d Reg. Sess. (Mar. 20, 2018). The testimony supporting this amendment focused on the trauma and psychological harm victims suffered even when their private parts were not shown in the image displaying a sexual act and described the need to strengthen safeguards for victims. *Id.*

¶ 46 Pellegrin does not argue that a female victim somehow suffers less harm when only a portion of her breast is exposed, as opposed to the entire breast. Instead, he argues that the limited discussion about "private intimate parts" during the legislative hearings favors his argument that "breast of a female" is limited to the display of the entire breast. And he contends that if the General Assembly had intended to include any portion of the female breast within the definition, it could have done so. *See, e.g.,* § 18-7-501(7), C.R.S. 2020 ("'Sexually explicit nudity' means . . . the showing of the female breast with less than a fully opaque covering of any portion

thereof below the top of the areola . . . ."); § 13-21-1402(7)(a), C.R.S. 2020 ("'Intimate image' means a photograph, film, video recording, or other similar medium that shows . . . female postpubescent nipple of a depicted individual . . . .").

¶ 47     In our view, however, the General Assembly did not communicate a clear intent to limit the term "breast of a female" to the entire female breast.  Rather, the legislative history reveals a clear purpose to protect victims from the harm caused by the posting of private intimate parts images online and to strengthen protections from those harms.  It does not follow that the harm is avoided or even lessened by posting a photo of only a portion of an identifiable person's exposed breast.  If the General Assembly had intended to limit the term "breast of a female" to the entire breast, it could have done so, and we may not add words to or subtract words from the statute.  *See Turbyne*, 151 P.3d at 567.

¶ 48     Construing the statute as a whole, we conclude that the term "breast of a female" includes any display of an identifiable female's exposed breast.  To conclude otherwise would frustrate the statute's purpose.  *See AviComm, Inc. v. Colo. Pub. Utils. Comm'n*, 955 P.2d 1023, 1031 (Colo. 1998) ("[T]he intention of the legislature will

prevail over a literal interpretation of the statute that leads to an absurd result."); *State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000) ("In any event, the ultimate goal is to determine and give effect to the intent of the General Assembly; in doing so, a reviewing court must follow the statutory construction that best effectuates the intent of the General Assembly and the purposes of the legislative scheme.").

## C. Constitutionality

¶ 49 Pellegrin next contends that interpreting "breast of a female" to include any portion of the breast renders the statute unconstitutionally vague and overbroad on its face. We disagree.

¶ 50 Under the posting a private image for harassment statute, § 18-7-107(1)(a), the prosecution must prove beyond a reasonable doubt that the defendant intended to harass, intimidate, or coerce the victim when the defendant posted or distributed an image displaying the identifiable victim's private intimate parts online without the victim's consent, or if the defendant knew or should have known the victim had a reasonable expectation that the image would remain private. And the victim must suffer serious emotional distress. *Id.*

¶ 51 The vagueness doctrine is rooted in principles of due process. *People v. Shell*, 148 P.3d 162, 172 (Colo. 2006). Due process requires that a law give fair warning of the prohibited conduct. *Id.* A law offends due process if "it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement." *Id.* (quoting *Parrish v. Lamm*, 758 P.2d 1356, 1367 (Colo. 1988)). Thus, a statute "is not void for vagueness if it fairly describes the conduct forbidden, and persons of common intelligence can readily understand its meaning and application." *Parrish*, 758 P.2d at 1367. To prevail on a facial challenge for vagueness, the challenger must show that the statute is incomprehensible in all its applications. *People v. McCoy*, 2015 COA 76M, ¶ 65, *aff'd on other grounds*, 2019 CO 44.[1]

¶ 52 Pellegrin argues that interpreting "breast of a female" to mean any portion of the female breast is unconstitutionally vague because it fails to give notice of how much of the breast must be

---

[1] Whether this principle remains valid "in all its applications" is questionable. *See People v. Graves*, 2016 CO 15, ¶ 25 n. 8; *People v. Plemmons*, 2021 COA 10, ¶¶ 18-19.

depicted and what conduct the statute criminalizes. However, Pellegrin focuses on one portion of the statute without considering the other elements of the offense.

¶ 53    In the context of the statute as a whole, our interpretation of "breast of a female" is specific enough to provide a person of common intelligence with notice that posting an image of any portion of the exposed female breast online is prohibited if such person posts the image with the requisite intent and without the victim's consent, or with knowledge that the victim had a reasonable expectation that the image would remain private. Thus, Pellegrin has not established that the statute is incomprehensible in all of its applications. *See Shell,* 148 P.3d at 172.

¶ 54    Regarding overbreadth, a statute is not unconstitutionally overbroad simply because it could possibly be applied in some unconstitutional manner. *People v. Baer*, 973 P.2d 1225, 1231 (Colo. 1999). "A statute is overbroad if it sweeps so comprehensively as to include within its proscriptions a substantial amount of constitutionally protected speech." *Id.*

¶ 55    Pellegrin does not argue that the statute sweeps so comprehensively as to include a substantial amount of

constitutionally protected speech. Indeed, the posting a private image for harassment statute requires proof of (1) an identifiable victim; (2) intent; (3) lack of consent (or knowledge that the victim had a reasonable expectation that the image would remain private); and (4) serious emotional distress of the victim. These elements, in addition to displaying the private intimate parts, narrow the statute's potential reach so as not to criminalize harmless behavior. *See Cross*, 127 P.3d at 78-79.

¶ 56 In this case, without the victim's consent, Pellegrin posted on Craigslist a private photo showing the side of the victim's exposed breast. The Craigslist ad invited strangers to contact the victim for a "good time" and included the victim's name, photos showing her face, her phone number, and directions to her home. The victim then received numerous text messages requesting sexual encounters and photos of male genitalia. As a result, the victim contacted the police, moved from her home, and quit her job. She testified that seeing private photos of herself online made her feel "violated" and "humiliated." This is precisely the type of harm section 18-7-107(1)(a) was intended to address.

¶ 57    Viewing this evidence in the light most favorable to the
prosecution, we conclude there was sufficient evidence to convict
Pellegrin of posting a private image for harassment on Craigslist.
*See People v. Harrison*, 2020 CO 57, ¶ 32 ("Under *Bennett*'s
substantial evidence test, we inquire whether the evidence, 'viewed
as a whole and in the light most favorable to the prosecution, is
substantial and sufficient to support a conclusion by a reasonable
mind that the defendant is guilty of the charge beyond a reasonable
doubt.'" (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d
466, 469 (1973))).

¶ 58    Accordingly, we discern no error.

## V.    Merger

¶ 59    Pellegrin next contends that harassment, § 18-9-111(1)(e), is a
lesser included offense of stalking, § 18-3-602(1)(c), under section
18-1-408(5)(c) and, thus, the convictions must merge.  For the
reasons explained below, we disagree.

### A.    Standard of Review and Applicable Law

¶ 60    "Whether an offense is a lesser included offense of another
requires statutory interpretation and therefore poses a legal
question that we review de novo."  *People v. Zweygardt*, 2012 COA

28

119, ¶ 10.  As well, we review de novo double jeopardy contentions. *People v. Frye*, 2014 COA 141, ¶ 30.  But because this issue was not preserved, we review it for plain error.  *Reyna-Abarca v. People*, 2017 CO 15, ¶ 47.

¶ 61 As set forth above in Part IV, we review questions of statutory interpretation de novo, and when construing a statute, our primary task is to ascertain and give effect to the General Assembly's intent.  *See Turbyne*, 151 P.3d at 567.

¶ 62 The Double Jeopardy Clauses of the United States and Colorado Constitutions protect criminal defendants from multiple punishments for the same offense.  U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18; *see also Reyna-Abarca*, ¶ 49.  Double jeopardy principles preclude the imposition of multiple punishments for the same offense unless the legislature has specifically authorized multiple punishments.  *Reyna-Abarca*, ¶ 50.

¶ 63 Under section 18-1-408(1)(a), a court may not enter convictions for two offenses arising from the same conduct if "[o]ne offense is included in the other."  An offense is included in another, under section 18-1-408(1)(a), if "the elements of the lesser offense are a subset of the elements of the greater offense, such that the

29

lesser contains only elements that are also included in the elements of the greater offense." *Reyna-Abarca*, ¶ 64.

¶ 64     Section 18-1-408(5) defines when an offense is included in a charged offense, and that definition is "substantially broader" that that in section 18-1-408(5)(a). *People v. Raymer*, 662 P.2d 1066, 1069 (Colo. 1983). Under section 18-1-408(5)(c), an offense is an included one if "[i]t differs from the offense charged *only* in the respect that a less serious injury or risk of injury to the same person, property, or public interest *or* a lesser kind of culpability suffices to establish its commission." (Emphasis added.) In other words, a lesser offense is included in the greater offense "if proof of the facts required to prove the statutory elements of the greater offense necessarily establishes all of the elements of the lesser offense except that the offenses require proof of a different *mens rea* element *or* degree of injury or risk of injury." *People v. Leske*, 957 P.2d 1030, 1040 (Colo. 1998) (emphasis added).

¶ 65     As relevant here, a person commits harassment if,

> with intent to harass, annoy, or alarm another person, he or she:
>
> . . . .

(e) Directly or indirectly initiates communication with a person or directs language toward another person, anonymously or otherwise, by telephone, telephone network, data network, text message, instant message, computer, computer network, computer system, or other interactive electronic medium in a manner intended to harass or threaten bodily injury or property damage, or makes any comment, request, suggestion, or proposal by telephone, computer, computer network, computer system, or other interactive electronic medium that is obscene.

§ 18-9-111(1)(e).

¶ 66    A person commits stalking if

directly, or indirectly through another person, the person knowingly:

. . . .

(c) Repeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship to suffer serious emotional distress.

§ 18-3-602(1)(c).

## B. Analysis

¶ 67    Pellegrin does not argue that harassment is a lesser included offense of stalking under the strict elements test set forth in section 18-1-408(5)(a). Instead, he argues that harassment is a lesser included offense under the broader test in section 18-1-408(5)(c).

¶ 68    The parties agree that harassment differs from stalking *both* in the degree of injury or risk of injury *and* the kind of culpability required. Indeed, harassment requires proof of intentional conduct while stalking requires proof of knowing conduct. As well, harassment is accomplished "in a manner intended to harass or threaten bodily injury," § 18-9-111(1)(e), while stalking is accomplished "in a manner that would cause a reasonable person to suffer serious emotional distress and does cause . . . serious emotional distress," § 18-3-602(1)(c). But the parties disagree about the meaning of the word "or" separating the mens rea language from the risk of harm language in section 18-1-408(5)(c). Pellegrin contends that "or" is not exclusive and means "and/or." *See In re Estate of Dodge*, 685 P.2d 260, 265-66 (Colo. App. 1984) (explaining the difference between the "inclusive 'or,'" "meaning A or B, *or both*," and the "exclusive 'or,'" "meaning A or B, but not both").

32

The People, on the other hand, argue that "or" is limited by the word *only* and that only one distinction between the two offenses may exist for them to merge — either the mens rea or the risk of harm. They reason that because the statutes reflect two distinctions, they do not satisfy the single distinction test and cannot merge under section 18-1-408(5)(c). We agree with the People and conclude, for two reasons, that the word "or" in subsection (5)(c) is exclusive and that an offense is a lesser included one only where the lesser offense differs in the degree of injury or risk of injury *or* in the kind of culpability, but not both.

¶ 69 First, "when the word 'or' is used in a statute, it is presumed to be used in the disjunctive sense, unless legislative intent is clearly to the contrary." *Armintrout v. People*, 864 P.2d 576, 581 (Colo. 1993); *see also People v. Valenzuela*, 216 P.3d 588, 592 (Colo. 2009) ("Use of the word 'or' is ordinarily 'assumed to demarcate different categories.'" (quoting *Garcia v. United States*, 469 U.S. 70, 73 (1984))); 1A Norman J. Singer & Shambie Singer, *Sutherland Statutory Construction* § 21:14, Westlaw (7th ed. database updated Nov. 2020) ("The literal meaning of ['and' and 'or'] should be followed unless it renders the statute inoperable or the meaning

becomes questionable."). A reviewing court may substitute the word "or" for "and" to avoid an absurd or unreasonable result. *See Smith v. Colo. Dep't of Hum. Servs.*, 916 P.2d 1199, 1201 (Colo. App. 1996).

¶ 70    The word "only" is restrictive and is synonymous with exclusively. Webster's Third New International Dictionary 1577 (2002); *see also Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1175 (9th Cir. 2015) ("The use of the word 'only' is routinely defined to mean alone, solely or exclusively."). Here, the General Assembly's inclusion of the word "only" before the disjunctive "or" evidences its intent to limit "or" to a single distinction between the offenses, rather than the "and/or" meaning Pellegrin suggests. *See* 3 Shambie Singer, *Sutherland Statutory Construction* § 57:8, Westlaw (8th ed. database updated Nov. 2020) ("Legislatures may signal such an intent by using the word "only," or by including a limiting clause after an affirmative direction.") (footnote omitted); Bryan A. Garner, *Garner's Dictionary of Legal Usage* 635 (3d ed. 2011) (the best placement for the word "only" is "before the words intended to be limited"); *see also Stanley v. Cottrell, Inc.*, 784 F.3d 454, 466 (8th Cir. 2015)

(finding the use of limiting words or phrases helpful in a disjunctive reading of the word "or"); *People in Interest of J.O.*, 2015 COA 119, ¶ 14 ("[T]he General Assembly's use of 'or' is limited by the word 'either.'"), *overruled on other grounds by People in Interest of T.B.*, 2021 CO 59.

¶ 71 Second, our supreme court's holdings in *Leske* and *Raymer* further counsel that the word "or" cannot be substituted with "and/or." In *Raymer*, the court held that aggravated robbery is a lesser included offense of felony murder (based on robbery) by concluding, under 18-1-408(5)(c), that the only difference between aggravated robbery and felony murder is the victim's death (risk of harm). *Raymer*, 662 P.2d at 1070 ("Where . . . the robbery victim is actually killed during the course of a robbery, then the crime of aggravated robbery differs from the charge of felony murder *only* in the sense contemplated by section 18-1-408(5)(c), namely, that an injury less serious than death suffices to establish its commission.") (emphasis added).

¶ 72 Similarly, in *Leske*, the supreme court held that sexual assault on a child is not a lesser included offense of sexual assault on a child by one in a position of trust, under 18-1-408(5)(c). *Leske*, 957

35

P.2d at 1041. It noted that the two offenses do not differ in culpability or risk of injury but, instead, differed in several other respects. *Id.* It concluded that "[b]ecause the offenses differ in ways other than those contemplated by subsection (5)(c), that subsection is inapplicable." *Id.*; *see also People v. Chapman*, 192 Colo. 322, 325, 557 P.2d 1211, 1213-14 (1977) (holding that "one who commits reckless driving necessarily has been guilty of careless driving" because the offenses differ *only* in the degree of negligence); *Gatrell v. Kurtz*, 207 P.3d 916, 918 (Colo. App. 2009) ("[T]he commas, which separate several distinct actions, the last of which is preceded by the disjunctive 'or,' demarcate different categories.").

¶ 73     As well, most of the divisions of this court that have applied subsection (5)(c) have applied a single distinction test. *See People v. Oliver*, 2020 COA 97, ¶ 63 (holding that second degree possession of contraband is a lesser included offense of first degree possession of contraband under section 18-1-408(5)(c) because the offenses differ "*only* as to the severity or risk of injury posed by the type of contraband each proscribe") (emphasis added); *People v. Hoggard*, 2017 COA 88, ¶¶ 32-33 (concluding second degree forgery is a lesser included offense of felony forgery because the "offenses differ

36

*only* with the respect to the type of document involved in the crime")
(emphasis added), *aff'd on other grounds*, 2020 CO 54; *People v.
Duran*, 272 P.3d 1084, 1096 (Colo. App. 2011) ("[R]eckless
manslaughter is a lesser included offense of first degree extreme
indifference murder because the offenses differ *only* as to degree of
culpability.") (emphasis added); *People v. Horton*, 683 P.2d 358, 361
(Colo. App. 1984) (holding that, where a first degree sexual assault
victim is killed during the assault, first degree sexual assault is a
lesser included offense of felony murder under section 18-1-
408(5)(c) because the offenses differ *only* in the degree of injury);
*see also People v. Palmer*, 944 P.2d 634, 639 (Colo. App. 1997)
("[B]ecause the offenses differ with respect to *both* the culpability
required *and* the injury or risk of injury required, we conclude that,
even under the provisions of [section] 18-1-408(5)(c), menacing is
not a lesser included offense of second degree assault."), *rev'd on
other grounds*, 964 P.2d 524 (Colo. 1998).

¶ 74    Nevertheless, even if we accepted Pellegrin's interpretation, the
outcome would not change.  Not only do stalking and harrassment
differ in the degree of injury or risk of injury and the degree of
culpability, but they also differ in the class of victims to which they

37

apply.  The class of victims under the stalking statute includes not only another person but "a member of that person's immediate family[] or someone with whom that person has or has had a continuing relationship." § 18-3-602(1)(c); *see Leske*, 957 P.2d at 1040 (holding that because the offenses addressed different classes of victims, section 18-1-408(5)(c) was inapplicable); *see also Zweygardt,* ¶ 26 ("Because this distinction is not one of the two ways that a lesser included offense can differ from the greater offense under section 18-1-408(5)(c), careless driving is not a lesser included offense of vehicular assault (reckless) under that subsection.").

¶ 75    Accordingly, we conclude harassment is not a lesser included offense of stalking under section 18-1-408(5)(c).

VI.    Domestic Violence Finding

¶ 76    Pellegrin last contends that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), he had a Sixth Amendment right to have a jury, not the trial court, determine whether the crime for which he was convicted included an act of domestic violence.  We disagree and conclude a domestic violence finding under section 18-6-

801(1)(a), C.R.S. 2020, does not impose a "penalty" as contemplated by *Apprendi.*

A. Standard of Review and Applicable Law

¶ 77 Trial courts have broad discretion over sentencing decisions. *Villanueva v. People,* 199 P.3d 1228, 1231 (Colo. 2008). "However, we review constitutional challenges to sentencing determinations de novo." *People v. Jaso,* 2014 COA 131, ¶ 8. Where an error of constitutional dimension occurs, "the sentence must be vacated unless the error was harmless beyond a reasonable doubt." *Id.* at ¶ 9 (quoting *Villanueva,* 199 P.3d at 1231).

¶ 78 The Sixth Amendment requires that any fact, other than the fact of a prior conviction, that increases the prescribed statutory maximum penalty must be submitted to a jury and be proved beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490; *see also Alleyne v. Unites States,* 570 U.S. 99, 102 (2013) (extending *Apprendi* by holding that any fact that increases a defendant's mandatory minimum sentence must also be found by a jury under the Sixth and Fourteenth Amendments); *Blakely v. Washington,* 542 U.S. 296, 303 (2004). But, "an essential prerequisite to the Sixth Amendment inquiry under *Apprendi* and *Alleyne* is that the

39

sentence must be punitive in nature." *People v. Heisler*, 2017 COA 58, ¶ 46; *see also People v. Rowland*, 207 P.3d 890, 895 (Colo. App. 2009) (concluding that where a sentence is not punitive, *Apprendi* is inapplicable).

¶ 79    Section 18-6-801(1)(a) authorizes a trial court to make a factual determination that the crime for which a defendant was convicted included an act of domestic violence, as defined by section 18-6-800.3(1), C.R.S. 2020.  If the court makes such a finding, domestic violence treatment is mandated in addition to any sentence imposed on the person.  § 18-6-801(1)(a).

¶ 80    In *Heisler*, ¶¶ 44-45, a division of this court held that section 18-6-801(1)(a) "does not run afoul of the Sixth Amendment" under *Alleyne* because "court-ordered domestic violence treatment . . . is not a form of punishment and, therefore, the statute does not mandate a 'penalty' as contemplated by *Apprendi*."  Applying the seven-factor test set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), the division concluded that domestic violence treatment was not "punishment" because it (1) imposes no affirmative disability or restraint; (2) was not historically regarded as punishment; (3) requires no finding of scienter; (4) is

40

rehabilitative, not retributive, in nature; (5) has no alternative, punitive purpose that undercuts its rehabilitative purpose; and (6) does not impose excessive burdens on a defendant. *Heisler*, ¶¶ 49-64.

## B.    Analysis

¶ 81    We find the reasoning in *Heisler* persuasive and apply it here. In doing so, we reject Pellegrin's contention that *Heisler* was wrongly decided. Specifically, he argues the division in *Heisler* applied the seven-factor test in *Mendoza-Martinez* without first determining whether a domestic violence finding is a criminal or civil punishment. *See People in Interest of T.B.*, 2019 COA 89, ¶ 21 ("To decide whether a statute creates a punishment, a court must first 'ascertain whether the legislature meant the statute to establish 'civil' proceedings.'") (citations omitted), *aff'd in part and rev'd in part*, 2021 CO 59. The Supreme Court, however, established the seven-factor test to assist in determining the punitive nature of a sanction. *Mendoza-Martinez*, 372 U.S. at 168; *see also United States v. Ward*, 448 U.S. 242, 249 (1980) (noting that the seven factors in *Mendoza-Martinez* are helpful considerations in determining whether Congress provided for

41

sanctions so punitive as to transform a civil remedy into a criminal penalty); *People in Interest of T.B.*, ¶¶ 31-47 (applying the *Mendoza-Martinez* factors in its analysis of whether a statute created a punishment). And we agree that the *Mendoza-Martinez* factors were the appropriate analytical framework to determine whether a domestic violence finding is a penalty.

¶ 82 In addition, we reject Pellegrin's reliance on *People v. Jaso*, 2014 COA 131. In *Jaso*, the trial court's domestic violence finding was used not only to mandate domestic violence treatment, but also as part of a larger habitual domestic violence offender determination. *Id.* at ¶ 1. Because the prosecution sought to increase the defendant's misdemeanor to a felony under the habitual domestic violence statute, thereby increasing the penalty for the crime, the defendant was entitled to have the jury make the domestic violence finding. *Id.* at ¶ 23.

¶ 83 In contrast, the domestic violence finding here did not increase the maximum or minimum punishment for the crime. Instead, the finding added a condition to Pellegrin's sentence — a domestic violence evaluation and any recommended treatment. *See* § 18-6-801(1)(a) ("*In addition to any sentence* that is imposed upon a

42

person for violation of any criminal law . . . .") (emphasis added); *see, e.g.*, *Christensen v. People*, 869 P.2d 1256, 1259 (Colo. 1994) ("[I]f the parole board determines an [incarcerated person] is in need of further treatment, it can condition parole upon participation in a sex offender treatment program.").

¶ 84    Still, Pellegrin maintains that the court's domestic violence finding is a penalty because it restricted his access to firearms pursuant to section 18-6-801(8)(a) and it could subject him to a felony domestic violence conviction in the future. We do not agree. First, when adding section 18-6-801(8), the General Assembly did not intend for the firearm restrictions to be punitive. Rather, the purpose of prohibiting domestic violence offenders from possessing firearms is to protect the community. *See* S.B. 13-197, 69th Gen. Assemb., 1st Reg. Sess. (Colo. 2013); *see also Mayo v. People*, 181 P.3d 1207, 1212 (Colo. App. 2008) (concluding that the sex offender registration requirement is not punitive in nature, but, rather, is designed to aid law enforcement officials and protect public safety); *People v. Milton*, 732 P.2d 1199, 1203-04 (Colo. 1987) (holding that a forfeiture sanction is not punitive, but remedial, in nature). Second, any future conviction and sentence based on the court's

domestic violence finding here is speculative and is therefore not ripe for our review. *See Stell v. Boulder Cnty. Dep't of Soc. Servs.*, 92 P.3d 910, 914 (Colo. 2004) ("In the interest of judicial efficiency, courts will not consider 'uncertain or contingent future matters' because the injury is speculative and may never occur.") (citation omitted).

## VII.   Conclusion

¶ 85    The judgment is affirmed.

JUDGE YUN and JUDGE GRAHAM concur.